UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

------------------------------------------------------X
                :

NATURAL RESOURCES DEFENSE    :
COUNCIL, INC.; RARITAN          :       — 91954
BAYKEEPER, INC.; ANDREW      :
WILLNER; and GREENFAITH,    :

                :    <u>OPINION AND ORDER</u>

          Plaintiffs,    :    05 Civ. 762 (SAS)

                :

   - against -         :

                :

UNITED STATES ARMY CORPS OF   :
ENGINEERS; and COL. RICHARD   :
POLO, JR., in his official capacity as  :
Commander and District Engineer,   :
United States Army Corps of Engineers, :
New York District,          :

                :

          Defendants.    :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/5/05

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

      Plaintiffs are a group of environmental organizations and concerned

citizens. They are challenging an ongoing project, to be carried out by the Army

Corps of Engineers ("Army Corps"), to deepen shipping channels in the New

York-New Jersey Harbor through dredging and blasting of the Harbor floor. The

Harbor Deepening Project ("HDP") is intended to open the Harbor to the newer,

larger and deeper-bottomed cargo vessels on which the modern shipping industry depends. Part of the HDP will cut through highly contaminated sections of Newark Bay and surrounding waterways. This contamination is the result of centuries of heavy industrial use of the Bay and its tributaries — in particular, the Bay is contaminated with the by-products resulting from the manufacturing of Agent Orange at the Diamond Alkali Chemical Plant, on the Passaic River, during the Vietnam War.

On February 13, 2004, the United States Environmental Protection Agency ("EPA") entered into an Administrative Order on Consent ("Feb. 2004 AOC"), which added Newark Bay to the Diamond Alkali Superfund Site, as the "Newark Bay Study Area of the Diamond Alkali Superfund Site." The AOC orders a Remedial Investigation/Feasibility Study ("RI/FS") to be carried out by Occidental Chemical Corporation under the supervision of the EPA. The RI will determine the extent and nature of contamination in the Bay, and the FS, based on what is learned from the RI, will evaluate possible cleanup options. Both aspects of the study are to begin in the summer of 2005. An essential component of the study is the sampling of the Bay's water to determine the distribution and concentration of contaminated sediments.

Plaintiffs believe that the HDP may delay or frustrate this sampling

2

effort, by disturbing and resuspending[1] the contaminated sediments that are to be sampled, undermining the study's attempt to map contaminant distribution — thereby delaying or even preventing the design of effective cleanup options. They insist that the Corps is acting arbitrarily and capriciously, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Adminstrative Procedure Act, 5 U.S.C. § 706 ("APA"), by proceeding with the HDP without preparing a Supplemental Environmental Impact Statement ("SEIS") to consider the possible detrimental effects of the HDP dredging on the RI/FS. The Corps argues that dredging will not significantly interfere with sampling for the RI/FS, and so there is no reason to prepare an SEIS.

The narrow issue presented here is whether the Army Corps gave a "hard look" to the possibility that the HDP will interfere with the sampling required by the RI/FS, and to ways of avoiding such interference, before deciding to go ahead with dredging without preparing an SEIS. If the Corps failed to take that hard look, its decision, by definition, was arbitrary and capricious.

After closely reviewing a voluminous record, I conclude that the Corps failed to take a hard look at this narrow question. Because the sampling

---

[1]     That is, suspending particles of contaminated sediment that have settled on the Bay's floor into the water of the Bay.

3

will ultimately be important in determining the need for a clean-up of the Bay, and the best way to approach that clean-up, it is important that any action that might adversely affect it be carefully considered. The issue is a narrow one, and it may be that, once the Corps *does* take a hard look at the possible effects of dredging on the RI/FS, it will find — as it hopes — that they are minor and easily controlled by cooperation between the Corps and the EPA, and that preparing an SEIS would merely result in burden and delay. But the issue is too important to be treated lightly. NEPA ensures that federal agencies must take a hard look at potential environmental problems before proceeding with their plans. The Corps must assess the impact of its dredging on the sampling required for the RI/FS before committing to a particular method of dredging, rather than waiting until dredging interferes with that sampling and causes unrecoverable delays to the potential cleanup process. Similarly, if the Corps relies on the promise of cooperation between the EPA and the Corps to minimize the effects of dredging on the RI/FS, the Corps must give full consideration to how that cooperation will be handled before committing to a particular method of dredging, not after problems arise. For the reasons set forth below, the Corps' decision to begin dredging without taking the required hard look at this problem was arbitrary and capricious.

The issue is before the Court on plaintiffs' and defendants'[2] cross-motions for summary judgment. Pursuant to the agreement of the parties, the Court has bifurcated review of plaintiffs' claims. This opinion addresses only the question of liability — that is, whether the Corps' decisions to proceed with the HDP without preparing an SEIS were based on adequate review of the environmental consequences of the HDP, as required by NEPA and the APA. I find that they were not, and the Corps is in violation of NEPA and the APA. The question of what remedy (if any) is necessary will be addressed in a subsequent opinion.

## II.  BACKGROUND

### A.  The Newark Bay Site

On September 21, 1984, the EPA added the Diamond Alkali Superfund Site to the National Priorities List, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").[3] The site consisted of the former Diamond Alkali chemical manufacturing plant and the

---

[2]  In addition to the Army Corps, two interested parties, Donjon Marine, Inc., and New York Container Terminal, Inc., have been granted permission to intervene as defendants.

[3]  *See* Feb. 2004 AOC ¶¶ 11-14 (recounting "History of Response Actions"), Administrative Record ("AR") 48:16136.

adjacent property. The EPA's RI/FS revealed that the site was highly contaminated with toxic substances, including dioxin, a by-product of the Agent Orange manufacturing carried out at the plant during the Vietnam War.[4]

The EPA's investigations also revealed hazardous substances in the sediments of the Passaic River.[5] These findings resulted in the EPA entering into an AOC, dated April 20, 1994, with Occidental Chemical Corporation ("Occidental"), the company responsible for the plant site. The 1994 AOC required Occidental to conduct an RI of a six mile stretch of the Passaic River, up and downstream from the plant site.[6] In 2003, the EPA determined that an expanded RI for a 17-mile stretch of the River (the "Lower Passaic River Study Area") was necessary. The EPA, the Army Corps, and the New Jersey Department of Transportation have entered into a partnership, the Lower Passaic River Restoration Project, to "identify and address water quality improvement,

---

[4]     See id. ¶¶ 14-16, AR 48:16136-37; see also Declaration of Lawrence Levine, Esq., in Support of Plaintiffs' Motion for a Preliminary Injunction ("Levine Decl.") ¶ 3, AR 48:16037.

[5]     See Feb. 2004 AOC ¶¶ 15-16, AR 48:16137; Levine Decl. ¶ 4, AR 48:16037-38.

[6]     See Feb. 2004 AOC ¶ 24, AR 48:16139.

remediation and restoration opportunities" in the Passaic River.[7] On June 22, 2004, the EPA entered into an AOC with thirty-one potentially responsible parties to fund the EPA's investigation of the Lower Passaic River Study Area.[8] The Lower Passaic River Study Area ends at the mouth of the River.[9] To date, no remedy has been determined for the Lower Passaic River Study Area.[10]

On November 19, 2003, plaintiffs NRDC and Raritan Baykeeper, Inc. ("Baykeeper"), served a notice of intent to sue Occidental under the Resource Conservation and Recovery Act, to compel a study of dioxin contamination in Newark Bay, which they allege had spread downstream from the Passaic River portion of the Diamond Alkali Superfund Site.[11] On February 13, 2004, the EPA entered into another AOC with Occidental under CERCLA.[12] The February 2004 AOC designated Newark Bay and portions of the Hackensack River and the

---

[7] *See* Declaration of George Pavlou, Director of the EPA's Emergency and Remedial Response Division, Region 2 Office, in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Pavlou Decl.") ¶ 7, AR 48:16271.

[8] *See id.*

[9] *See id.* ¶ 8, AR 48:16278.

[10] *See id.* ¶ 9, AR 48:16278.

[11] *See* Levine Decl. ¶ 6, AR 48:16038.

[12] *See id.* ¶ 7, AR 48:16038. *See also* Feb. 2004 AOC, AR 43:12406-61.

Arthur Kill and Kill van Kull channels as the Newark Bay Study Area of the Diamond Alkali Superfund Site (the "Newark Bay Study Area").[13] Pursuant to the AOC, the EPA "has determined that conditions in the Newark Bay Study Area may present an imminent and substantial endangerment to public health, welfare or the environment."[14]

Under the terms of the AOC, Occidental has undertaken to perform an RI/FS in the Newark Bay Study Area, under the supervision of the EPA, "to determine the nature and extent of contamination . . . and to develop and evaluate remedial alternatives."[15] Among other things, the RI will "determine the [] distribution and concentration of [contaminants] for the Newark Bay Study Area sediments," in order to "identify 'hot spots' for potential short term action[;] identify potential exposure concentrations through the food chain for human and ecological receptors [and] evaluate prospective remedial alternatives."[16] In addition, the RI will "determine the primary human and ecological receptors of [contaminated sediments] in the Newark Bay Study Area" and "determine the

---

[13]    *See* Levine Decl. ¶7, AR 48:16038.

[14]    Feb. 2004 AOC, ¶ 34, AR 48:16141.

[15]    *Id.*

[16]    Feb. 2004 AOC Statement of Work at 3, AR 48:16147.

8

direct and indirect continuing sources of [contaminants] to the sediments in the Newark Bay Study Area."[17] The FS will evaluate a range of possible remedial actions, from "[t]reatment alternatives for source control of contaminated [sediments] that would eliminate the need for long term management," through "[a]n alternative that involves containment of waste with little or no treatment," to "[a] no action alternative."[18] A company known as Tierra Solutions, Inc., ("Tierra") is performing the work under the AOC on behalf of Occidental.[19]

Occidental submitted a draft work plan to conduct the RI for the Newark Bay Study Area in June 2004.[20] The draft RI/FS contains a draft Inventory Report (the "June 2004 Inventory Report") compiling data on contaminated sediment, flora and fauna, and water in and around Newark Bay.[21] The plan is subject to the approval of the EPA. Based on public comments, the EPA anticipates that the draft work plan will need modification.[22] The EPA is

---

[17]  *Id.*

[18]  *Id.* at 10, AR 48:16154.

[19]  *See* Levine Decl. ¶ 8, AR 48:16039.

[20]  *See id.* ¶ 9, AR 48:16039.

[21]  *See id.*

[22]  *See* Pavlou Decl. ¶ 10, AR 48:16272.

revising the study, with the intention of beginning field sampling of contaminated sediments in the Newark Bay Study Area in the summer of 2005.[23]

## B.    The Harbor Bay Deepening Project

The Port of New York and New Jersey ("the Port") is the third largest in the nation.[24] In 2004, $114 billion in cargo passed through the Port.[25] A 2001 study conducted by the Center for Urban Policy Research at Rutgers University found that

> cargo movement in 2000 provided nearly 101,700 direct full-time equivalent jobs and supported an additional 125,585 in-direct full-time equivalent jobs in the 26-county metropolitan region. Furthermore, the goods movement thru the port region supported an additional 185,715 jobs elsewhere in the nation (not including the jobs of people producing goods shipped). [26]

In recent years, under the pressure of globalization, the ocean carrier industry has seen a movement toward the concentration of capacity in fewer ships

---

[23]    *See id.*

[24]    *See* Declaration of Thomas H. Wakeman, General Manager of Waterways Development, Port Commerce Department, Port Authority of New York and New Jersey, in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Wakeman Decl."), ¶ 5, AR 48:16310.

[25]    *See id.*

[26]    *Id.* ¶ 8 (summarizing study), AR 48:16311.

and ports.[27] At the same time, there has been a trend toward the development of larger cargo vessels, capable of carrying cargo more efficiently and achieving economies of scale.[28] The navigation channels in the Harbor are not presently deep enough to serve fully loaded ships of the latest design.[29]

Beginning in 1986, Congress has authorized the Army Corps to undertake a number of projects to deepen the navigational channels in the New York and New Jersey Harbor.[30] These projects included the Kill Van Kull 45' Deepening Project, the Arthur Kill 41/40 Deepening Project, The Port Jersey 41' Deepening Project, and the New York and New Jersey Harbor Deepening Project.[31] In 2002, Congress ordered the Army Corps to consolidate each of these projects into one overall deepening project, known as the HDP.[32] The HDP will

---

[27]    *See id.* ¶¶ 10-11, AR 48:16312-13.

[28]    *See id.*

[29]    *See id.* ¶ 12, AR 48:16313-14.

[30]    *See* Declaration of Jenine Gallo, Army Corps Lead Wildlife Biologist and Section Chief in the Environmental Branch of the Planning Division, in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Gallo Decl."), ¶¶ 4-5, AR 48:16220-21.

[31]    *See id.*

[32]    *See id.,* ¶ 6, AR 48:16221. Some parts of the project, including the Arthur Kill channel deepening, were consolidated for purposes of authorization and budgeting, but not implementation. *See* January 2004, Environmental

deepen all of the navigational channels in the New York and New Jersey Harbor to 50 feet.[33]

## C. NEPA Review of the Harbor Deepening Project

The various phases of the HDP have been subjected to extensive environmental review under NEPA and under section 401 of the Clean Water Act, 33 U.S.C. § 1341. In total, the Army Corps has produced over a dozen separate NEPA documents analyzing the project, beginning with a 1980 Final Environmental Statement.[34] The most important of these is a Final Environmental Impact Statement ("FEIS"), issued by the Army Corps in December 1999, to "identify, screen, evaluate and recommend a plan for channel improvements throughout the Port of New York and New Jersey."[35] Among other factors, the 1999 FEIS analyzed the environmental effects of resuspension of contaminated sediments as a result of dredging, and the potential effects of such resuspension on

---

Assessment and Limited Reevaluation Report on Consolidated Implementation of the New York New Jersey Harbor Deepening Project ("Jan. 2004 EA/LRR"), AR 3:380.

[33]    *See* Gallo Decl. ¶ 6.

[34]    *See id.* ¶ 5. *See also* July 1980 Final Environmental Statement, Newark Bay — Kill Van Kull Navigation Project, AR 27:10700-10.

[35]    December 1999 FEIS, New York and New Jersey Harbor Navigation Study ("1999 FEIS"), AR 11:2581.

"exposure of biological receptors to contaminants."[36] The FEIS concluded that:

> two opposing effects on biological exposure to contaminants are anticipated from deepening the navigation channels in the New York and New Jersey Harbor. Dredging of the channels, and the resulting suspension of contaminated sediments into the water column, is expected to increase exposure of biological organisms. This is expected to occur, however, only in areas close to the dredging operations and should be relatively short-lived because suspended sediments are expected to settle out of the water column within a relatively short period. Furthermore, sediment suspension from ship traffic in narrow channels has been shown to be greater than from dredging activities. It is therefore possible that any increase in exposure due to dredging will be minimal compared to other more frequent disturbances in the Harbor. On the other hand, dredging the channels is also expected to remove a large amount of contaminated sediments from the bottom of the channels, thus exposing a new layer of relatively clean sediment. This effect, however, is also expected to be short-lived . . . [T]he system should stabilize and return to current conditions within a few months to a few years, depending on the area of the Harbor. Furthermore, Best Management Practices (BMPs) will be used during dredging operations to minimize the suspension of sediments. . . In addition, sediment contaminant analysis, where necessary, will be performed for the next phase of the project, and will be coordinated with the appropriate regulatory authorities.[37]

In 2001, the Army Corps signed a Pre-construction Engineering and Design Agreement with the Port Authority of New York and New Jersey.[38]

---

[36]     *Id.*, AR 11:2796.

[37]     *Id.*, AR 11:2804.

[38]     *See* Gallo Decl. ¶ 10, AR 48:16223.

13

Pursuant to Army Corps regulations, the Army Corps updated its environmental analysis of resuspension of sediments resulting from dredging operations.[39] The Army Corps updated its environmental analysis again following the 2002 consolidation of the various projects into the HDP. Because the consolidation resulted in some changes to the design of the project, and additional deepening in some areas, the Army Corps conducted an Environmental Assessment ("EA").[40] The public comment period for this EA opened in November, 2003.[41] In January 2004, the Army Corps issued its Limited Reevaluation Report and EA, with a Finding of No Significant Impact ("FONSI").[42] The EA/LRR found that "[d]ata comparison and evaluation identified no new potential adverse environmental impacts attributable to consolidation. Potential short term impacts due to consolidated implementation would be the same as the effects on aquatic resources identified in the [prior EIS], except the overall duration under a consolidated schedule would be shorter."[43]

---

[39]  *See id.*

[40]  *See id.* ¶ 11, AR 48:16223-24.

[41]  *See id.* ¶ 12, AR 48:16224.

[42]  *See* Jan. 2004 EA/LRR, AR 3:324-578.

[43]  *Id.*, AR 3:419.

**D. Clean Water Act Review of the Harbor Deepening Projects**

In addition to its obligations under NEPA, the Army Corps applied, pursuant to the Clean Water Act, for "umbrella" Water Quality Certificates ("WQCs") from the States of New York and New Jersey, as part of the approval process for the HDP.[44] Following formal public hearings on February 12, 2004 in Staten Island, New York and March 10, 2004 in Bayonne, New Jersey, the Army Corps received WQCs from both states.[45] The WQCs impose extensive "Special Conditions" on the dredging practices used in the deepening projects.[46] For example, the WQC issued by New York specifies the type of "environmental bucket" to be used for dredging.[47] The WQCs also require ongoing monitoring of certain environmental impacts and the submission of additional "Permit Documents." Among other things, the New York WQC requires that "a sediment sampling plan for purposes of conducting bulk chemistry analysis for each

---

[44]    *See* Gallo Decl. ¶ 22, AR 48:16226.  Section 401 of the Clean Water Act requires federal agencies (or any other person) to apply for a license from a state if they intend to engage in any "construction or operation" that will result in a discharge of pollutants into the navigable waters of that state.  33 U.S.C. § 1341(a)(1).

[45]    *See* Gallo Decl. ¶¶ 23-25, AR 48:16227.

[46]    *See id.* ¶ 25, AR 48:16227.

[47]    *See* New York State Department of Environmental Conservation, Special Conditions for DEC Permit No. 2-6499-00001/00002, AR 48:16259.

15

contract reach be submitted for [New York State Department of Environmental Conservation] approval in coordination with the State of New Jersey at least 60 days prior to the anticipated start date for a given reach."[48]

### E.    Environmental Review Following the February 2004 AOC

On February 13, 2004, the EPA informed the Army Corps by email that the AOC designating the Newark Bay Study Area had been signed.[49] An Army Corps employee named Thomas Shea, at the time the manager of the Lower Passaic River project, and now manager of the HDP, responded to that email on February 17, 2004, asking "[w]hat impact does this have on our navigation jobs, where we are dredging portions of Newark Bay?"[50] On March 11, 2004, Shea circulated the AOC to twenty-one Army Corps employees.[51] Shea noted that "As a result of this order, I have some basic questions on what this may mean to our various programs (predominantly our . . . deepening projects . . .). . . . Could you please review the order and develop your own set of questions and send them to

---

[48]    *Id.*

[49]    *See* February 13, 2004 email from Patricia Hick of the EPA to Thomas Shea of the Army Corps, AR 42:12550.

[50]    February 17, 2004 email from Shea to Hick, AR 42:12550.

[51]    *See* March 11, 2004 email from Shea to Distribution List, AR 42:12551.

me. I will consolidate them and EPA will review and meet with us to discuss them."[52] Shea received several responses, although none substantively addressing the effect of dredging on the RI/FS.[53]

In May, and again in October, Elizabeth Butler of the EPA attempted, by email, to arrange a meeting with Shea to discuss coordination between the Army Corps' and the EPA's activities in the Bay.[54] In the meantime, in May and September 2004, plaintiffs raised their concerns with the EPA and the Army Corps, by letter, email and orally.[55] Notably, in a May 3, 2004 email to Shea, Baykeeper requested a meeting "to discuss [Army Corps] coordination with EPA, especially with respect to dredging in Newark Bay and other areas under study under the guise of CERCLA."[56] In a September 28, 2004 letter to the EPA (and copied to the Army Corps), NRDC and Baykeeper presented a detailed list of

---

[52]    *Id.*

[53]    *See* AR 42:12552-53, 13000-03.  For example, Lorraine Lee of the Army Corps emailed Shea on March 17, 2004, to ask "How do [Occidental's] activities and suspense dates fit in with our schedules?"  AR 42:13003.  There is no record of an answer.

[54]    *See* May 10, 2004 email from Butler to Shea, AR 42: 12561; October 14, 2004 Email from Butler to Shea, AR 42:12562-63.

[55]    *See* Levine Decl. ¶ 22, AR 48:16043-44.

[56]    May 3, 2004 Email from Debbie Mans, Policy Associate of NY/NJ Baykeeper, to Shea, AR 42:18000.

objections to Tierra's draft work plan for the RI/FS; among other things, plaintiffs complained that Tierra's work plan failed to consider the "obvious overlap" between their sampling activities and the Army Corps' dredging.[57]

On October 18, 2004, representatives of the EPA and the Army Corps finally met to discuss the deepening projects.[58] At that meeting, the Army Corps provided EPA with a preliminary schedule and map of planned deepening projects to assist with the coordination of the projects.[59] During the following months, the EPA and the Army Corps continued to communicate, while plaintiffs continued to press their concern. On November 24, 2004, plaintiffs wrote to Colonel Richard J. Polo, Commander and District Engineer of the Army Corps, New York District, to request a meeting to discuss their fear that dredging would "undermine the

---

[57]    September 28, 2004 Letter from Plaintiffs to Amelia M. Wagner, Office of Regional Counsel, EPA, AR 42:11479-85.

[58]    *See* October 14, 2004 email from Butler to Shea and responsive emails, AR 42:12562-63.

[59]    *See* Pavlou Decl. ¶ 12. Although Pavlou's Declaration was prepared after the closing of the record with respect to the Arthur Kill project, the Court may consider it for the purpose of explaining what took place at the October 18 meeting, where the record is otherwise silent. *See Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 209 (1st Cir. 1999) ("So long as the new [affidavit] is explanatory of the decisionmakers' action at the time it occurred [] and does not contain post-hoc rationalizations for the agency's decision [] the new [affidavit] may be considered.").

viability" of the RI to be conducted in the Bay, and "by interfering with the study [, would] delay or prevent an effective Superfund cleanup of contaminated sediments."[60]

Internal Army Corps memoranda from early December record conversations between the EPA and the Army Corps. One of these memos records that the EPA informed the Corps that "Newark Bay is not officially part of a Superfund Site yet, but after the Sampling effort is completed [] and Remedial Investigation/Feasibility Study report is done it will most likely be designated as a site."[61] According to the memo, the EPA "would like to get a better handle on our dredging schedule to coordinate there [sic] sampling efforts."[62] A second memo records that the EPA stated that "whether Newark Bay is designated a Superfund Site will not prevent all activity, such as harbor deepening. If it is designated a Superfund Site, EPA will likely look to the Hudson River (a Superfund Site that was dredged) to determine how to approach Newark Bay."[63]

---

[60] November 24, 2004 Letter from Plaintiffs to Polo, AR 42:11486-88.

[61] December 1, 2004 Memorandum from Adam Perelson of the Army Corps to Jenine Gallo "re: conversation with Elizabeth Butler of EPA regarding Newark Bay," AR 42:12564.

[62] *Id.*

[63] December 1, 2004 Memorandum from Perelson to Bill Shadel of the Army Corps "re: conversation with Alice Yeh of EPA regarding Newark Bay."

On December 6, 2004, officials of the Corps and the EPA met to discuss NRDC's concerns regarding the impact of the Army Corps' dredging on the EPA's sampling activities.[64] Army Corps memoranda prepared by Shea and by another Corps project manager, Scott Nicholson, summarized the "key points/conclusions" of the meeting: specifically, that "[t]he EPA is in the early stages of determining what studies are needed to determine the [] extent [] of hazardous material and what remediation methods should be performed, if warranted;" and that "[t]he EPA saw no reason for the USACE to stop any of its navigation projects."[65] The EPA

> noted that just because EPA designated an area for study, it does not mean you cannot dredge. They felt that the claim that dredging would exacerbate the imminent and substantial endangerment to human health was not accurate based on previous sampling and dredging. In this context, they also noted that there was no new information that was found and used for the Newark AOC that would affect that understanding. In addition, based on existing information and ongoing coordination, the dredging planned for the HDP in Newark Bay would not delay or

---

AR 42:12565.

[64]     See December 6, 2004 Meeting Agenda, "Corps/EPA Meeting to Discuss: EPA CERCLA Study of Newark Bay and the NRDC Letter to Col. Polo.," AR 42:12573.

[65]     December 6, 2004 Memorandum for Record by Nicholson ("Dec. 6 Nicholson Mem."), AR 42:12574-75.

prevent an effective cleanup or exacerbate existing conditions.[66]

However, the EPA "would not comment on [the Army Corps'] need for additional

NEPA documentation. They stated that this was a USACE decision to make."[67]

On December 8, 2004, Army Corps staff, including Polo, met with

representatives of plaintiffs and the EPA, at the request of NRDC, to discuss

dredging methods.[68] The following day, the Army Corps initiated a team review

by its NEPA specialists to determine whether further NEPA review was required.[69]

The results of this review are documented in a memorandum dated December 16,

2004.[70] As part of this review, the Corps reviewed its NEPA documents prepared

since 1999.[71] The Corps also re-evaluated its methods for minimizing

---

[66]    *Id.* Shea also produced a Memorandum for Record for the December 6 meeting. Shea's memorandum simply records that "The EPA saw no reason for the USACE to stop any of its navigation projects," without further elaboration. AR 42:12572.

[67]    Dec. 6 Nicholson Mem.

[68]    *See* December 8, 2004 Memorandum for Record, "Meeting with Natural Resources Defense Council (NRDC)," AR 42:12577-79.

[69]    *See* Gallo Decl. ¶ 18, AR:4816225.

[70]    *See* December 16, 2004 Memorandum for Record, "Preliminary Results of PL-E Reanalysis of HDP Post-EPA CERCLA Designation of Newark Bay" ("Dec. 16 Mem."), AR 2:259-63.

[71]    *See id.* ¶ 3.

resuspension of sediment in dredging.[72] In addition, the Corps compared the

dredging methods to be used in Newark Bay with those used in the Hudson River,

a Superfund site in which General Electric will be performing a cleanup of PCB-

contaminated material, a process which will include remedial dredging and a

limited amount of navigational dredging.[73] The Corps concluded that the dredging

methods and "resuspension control technologies" used in the Hudson River, to the

extent that they differed from those planned for Newark Bay, were "a poor fit for

our project" or unsuited to navigable waters.[74] Finally, the Corps contacted its

New England District to discuss the dredging methods used in a Superfund

cleanup in New Bedford Harbor, Massachusetts.[75]

     Ultimately, the Corps concluded that "the Newark Bay issue was

addressed in detail in the EIS, and no substantial changes in the physical or

chemical nature of its sediments in the project occurred as a result of the AOC.

Therefore all analyses conducted and conclusions derived from them in the

---

[72]    *See* December 14, 2004 Memorandum to Record, "Approaches on Minimizing Re-suspension of Sediment in Dredging," AR 2:264-73.

[73]    *See* December 14, 2004 Memorandum to Record, "Comparison of Hudson River PCBs Cleanup and NY Harbor 50," AR 2:274-79.

[74]    *Id.*

[75]    *See* Dec. 16 Mem., AR 2:260.

original EIS are still valid."[76] Because "there have been no substantial changes in existing conditions or project plans as a result of the ACO [sic, AOC]," the Corps further concluded that there was no need to prepare an SEIS.[77] However, "in that CERCLA designation may be perceived by the public as significant of itself, the District should, in the interest of full public disclosure, prepare an EA/FONSI to document why no further supplemental EIS is needed."[78] Shortly afterwards, on December 29, 2004, the Corps awarded the first contract for dredging in the Arthur Kill Channel.[79]

On January 4, 2005, NRDC served the Corps with a notice of intent ("NOI") to sue, demanding that the Corps prepare an SEIS.[80] On February 16, 2005, plaintiffs moved for a preliminary injunction halting the HDP. The Corps formed another environmental review team to analyze plaintiffs' arguments, including plaintiffs' concern that dredging would interfere with the study phase of the RI/FS, and two environmental reports that plaintiffs claimed contained new

---

[76]    *Id.*

[77]    *Id.*

[78]    *Id.,* AR 2:262-63.

[79]    *See* December 29, 2004 Letter from Army Corps to Donjon Marine Co., Inc., AR 39:15000-02.

[80]    *See* January 4, 2005 Notice of Intent to Sue, AR 42:11490-503.

information.[81]

On February 28, 2005, the Corps released an SOF, which concluded that were no significant new circumstances or information that would require preparation of an SEIS.[82] In that Statement, the Corps determined that the new reports relied on by plaintiffs contained no new significant new information.[83] The SOF, and the documents attached thereto, also reviewed the Corps' dredging methods, its coordination with the EPA, its ongoing monitoring obligations under its WQCs, and the dredging methods used by the Corps' New England District in Superfund cleanup sites.[84] In a declaration prepared in opposition to plaintiffs'

---

[81]     See Gallo Decl. ¶ 21, AR 48:16226. The two reports are the June 2004 Inventory Report, prepared by Tierra as part of the draft work plan for the RI/FS, AR 28:10711-11205, and the June 2003 Containment Assessment and Reduction Project: NY/NJ Harbor Sediment Report 1998-2001 ("CARP Report") prepared by the New York State Department of Environmental Conservation, Division of Water, AR 29:11206-11301. Plaintiffs do not rely on these reports in their motion for summary judgment.

[82]     See SOF, AR 1:1-14120.

[83]     See id., AR 1:1-16, 56-61.

[84]     See id., AR 1:1-16. See also id., "Draft 2005 NRDC NOI Response Table ¶ 50," AR 1:189-94 ("the EPA has repeatedly stated that they do not consider the [HDP] to be an interference with the CERCLA Study of the Newark Bay area. Further, since the material to be removed by the HDP dredging is tested prior to its removal to determine its placement options and these test results are provided to the state regulatory agencies for their use in issuing Water Quality Certificates, the District is confident that the material being removed will not impact the results of the FS/RI or any potential remedial action.").

motion for a preliminary injunction, Dr. Robert M. Engler, a Senior Scientist
(Environmental) for the Army Corps, summarized his finding that dredging would
not "negatively impact proposed Superfund investigations."[85] Dr. Engler also
found that:

> Based on field observations; the nature of contaminant
> mobilization; modeling; operational requirements of the dredge;
> surveys of the distribution and magnitude of contaminant
> concentration; physical, chemical and toxicological assessments;
> and overall knowledge of the entire estuary — all of which have
> been evaluated by USACE — the preponderance of evidence and
> experience in this system indicates that resuspended sediments
> from dredging will be minimal (particularly when compared to
> other sources of resuspension). Similarly, resuspension will be
> short-lived, and generally limited to the immediate vicinity of the
> dredging operation. . . . Moreover, resuspension from a properly
> operated environmental dredge will usually be less than 1 percent
> of the total amount dredged.[86]

Ultimately, the Corps concluded that there were no significant new data or
circumstances that would require preparation of an SEIS.[87] On March 11, 2005,
the Army Corps awarded the first contract for dredging in the Kill van Kull

---

[85]    Declaration of Robert M. Engler, Ph.D, in Opposition to Plaintiffs'
Motion for a Preliminary Injunction ("Engler Decl.") ¶ 3, AR 48:16305.

[86]    *Id.* ¶ 17, AR 48:16305.

[87]    *See* SOF, AR 1:9-11.

25

Channel.[88]

## III.  LEGAL STANDARD

### A.    The Procedural Requirements of NEPA

The procedural requirements of NEPA are intended to ensure that the "broad national commitment to protecting and promoting environmental quality [] is 'infused into the ongoing programs and actions of the Federal Government.'"[89] Among other requirements, NEPA directs that all federal agencies must, for every major federal action significantly affecting the quality of the human environment, prepare a detailed EIS.[90] The EIS must examine 1) the environmental impact of the proposed action; 2) any adverse environmental effects which cannot be avoided should the proposal be implemented; 3) alternatives to the proposed action; 4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and 5) any irreversible and irretrievable commitments of resources that would be involved in

---

[88]    *See* March 11, 2005 Letter from Army Corps to Bean Stuyvesant, L.L.C., AR 39:15063.

[89]    *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (quoting 115 Cong. Rec. 40416 (Dec. 20, 1969) (remarks of Sen. Henry M. Jackson)).

[90]    *See* 42 U.S.C. § 4332(C).

the proposed action should it be implemented.[91] This statutory requirement

> ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.[92]

If the agency is uncertain whether the impacts rise to the level of a major federal action requiring an EIS, the regulations of the Council on Environmental Quality (the "CEQ")[93] require that the agency must prepare an EA.[94] An EA is "a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a FONSI, in which case preparation of an EIS is unnecessary."[95] "When the determination that a significant impact will or will not result from the proposed

---

[91]    *See id.*

[92]    *Robertson,* 490 U.S. at 348.

[93]    The CEQ, created under NEPA, is responsible for promulgating regulations that supplement NEPA's statutory requirements.

[94]    *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9. *See also National Audubon Soc'y v. Hoffman,* 132 F.3d 7, 12 (2d Cir. 1997).

[95]    *Sierra Club v. Espy,* 38 F.3d 792, 796 (5th Cir. 1994). *See also* 40 C.F.R. § 1508.9(a).

action is a close call, an EIS should be prepared."[96]  "The fact that effects are only a possibility does not insulate the proposed action from consideration under NEPA, but it does accord an agency some latitude in determining whether the risk is sufficient to require preparation of an EIS."[97]

An agency's obligations under NEPA do not end with the preparation of an EIS.  The agency may be required to prepare an SEIS "if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"[98]  An agency's determination whether to prepare an SEIS in light of new information or circumstances is governed by a "rule of reason."[99]  "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable."[100]  However, an agency must prepare an SEIS whenever major federal action is yet to occur which the new information shows will affect the quality of the human environment in a

---

[96]    *National Audubon Soc'y*, 132 F.3d at 13.

[97]    *Orangetown v. Gorsuch*, 718 F.2d 29, 38 (2d Cir. 1983).

[98]    *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372 (1989) (quoting 40 C.F.R. § 1502.9(c)).

[99]    *Id.* at 373.

[100]    *Id.*

significant manner or to a significant extent not already considered.[101]   As with

the decision to prepare an EIS, "[c]lose calls should be resolved in favor of

preparing a SEIS."[102]   If the agency determines that new information is not

sufficiently significant to require an SEIS, the agency is not necessarily required to

produce a formal NEPA document explaining its decision.[103]

Ultimately, "NEPA is a procedural statute that mandates a process

rather than a particular result."[104]   "The only role for a court is to insure that the

agency has taken a 'hard look' at environmental consequences; it cannot 'interject

itself within the area of discretion of the executive as to the choice of the action to

be taken.'" [105]   As long as the agency has given adequate consideration to the

---

[101]   *See id.* at 374.  At the time, the Court has not been requested to
determine whether an SEIS should be prepared, but only whether the Corps'
decision to proceed with the HDP in the absence of an SEIS was supported by a
hard look at the relevant facts, and was not arbitrary or capricious.

[102]   *Senville v. Peters*, 327 F. Supp. 2d 335, 356 (D. Vt. 2004) (citing
*National Audubon Soc'y*, 132 F.3d at 13 (discussing determination of significance
in deciding whether to prepare EIS)).

[103]   *See Friends of River v. Federal Energy Regulatory Com.*, 720 F.2d
93, 109 (D.C. Cir. 1983).

[104]   *Stewart Park & Reserve Coalition, Inc. v. Slater*, 352 F.3d 545, 557
(2d Cir. 2003).

[105]   *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21(1976) (quoting *NRDC
v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972)).

environmental consequences of its actions, NEPA does not preclude it from "deciding that other values outweigh the environmental costs."[106]

## B. The Standard of Review

The Administrative Procedure Act governs judicial review of an agency's compliance with NEPA.[107] That Act provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure required by law."[108] "[A]n agency decision is entitled to a presumption of regularity, and the burden of proof is on the party challenging the agency's decision."[109]

Review of an agency's decision not to supplement an EIS is controlled by the 'arbitrary and capricious' standard of § 706(2)(A) of the APA.[110] A reviewing court must make a "searching and careful" inquiry into "whether the

---

[106]    *Robertson*, 490 U.S. at 350.

[107]    *See Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985).

[108]    5 U.S.C. §§ 706(2)(A), (D).

[109]    *Vermont Pub. Interest Research Group v. United States Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 505 (D. Vt. 2002).

[110]    *See Marsh*, 490 U.S. at 376.

decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[111] In the Second Circuit, this review has two steps. *First*, the court considers "whether the agency took a 'hard look' at the possible effects of the proposed action."[112] *Second*, if the court is satisfied that the agency took a hard look, the court must determine "whether the agency's decision was arbitrary or capricious."[113]

Although a "court may not substitute its judgment for that of the agency," an agency decision may be set aside as arbitrary and capricious where the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important part of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[114]

When specialists express conflicting views, the court must defer to the agency's reliance on the reasonable opinions of its own qualified experts, "even if, as an

---

[111]  *Id.* at 378.

[112]  *Village of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir. 1991).

[113]  *Id.*

[114]  *NRDC v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001).

original matter, a court might find contrary views more persuasive."[115] "[I]t is for the agency to evaluate new information and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures."[116] However, courts should not automatically defer to the agency "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance — or lack of significance — of the new information."[117]

Subject to certain exceptions, "a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision."[118] The Court has already determined, in a ruling dated May 9, 2005, that there are two relevant decisions. On December 29, 2004, the Army Corps awarded a contract with respect to the Arthur Kill 40/41 project, and thus made a decision, for purposes of NEPA, to proceed with that project without preparation

---

[115]   *Marsh*, 490 U.S. at 378.

[116]   *Sierra Club v. United States Army Corps of Eng'rs*, 701 F.2d 1011, 1035 (2d Cir. 1983) (quoting *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980)).

[117]   *Id.*

[118]   *National Audubon Soc'y*, 132 F.3d at 14. *Cf. Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) (in SEIS case, admitting documents created after the start of litigation to determine issue of remedy, but not liability).

of an SEIS. The adequacy of the Army Corps' decision with respect to the Arthur Kill 40/41 project must be judged based on the record as of December 29, 2004. The Corps maintains, and this Court held in its prior ruling, that the Arthur Kill 41/40 project is separable from the remainder of the HDP. With respect to the remainder of the HDP, the relevant decision occurred on March 11, 2005, when the Corps awarded a contract for the S-KVK-2 project in the Kill van Kull Channel, a project which the Corps concedes is inseparable from the broader HDP.

This case is before the Court on the parties' cross motions for summary judgment. Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[119]

## IV.    DISCUSSION

### A.    Standing

Although defendants do not challenge plaintiffs' standing, "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional]

---

[119]    *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, (1986).

doctrines.'"[120]

> Three elements comprise the irreducible constitutional minimum
> of standing. First, the party seeking judicial resolution of its
> claim must have suffered an injury-in-fact — an invasion of a
> legally protected interest which is (a) concrete and particularized,
> and (b) actual or imminent, not conjectural or hypothetical. A
> 'particularized' injury is one that affects the plaintiff in a personal
> and individual way. Second, there must be a causal connection
> between the injury and the conduct complained of. Third, it must
> be likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision.[121]

Because plaintiffs assert a violation of a procedural right under

NEPA, a lesser showing of immediacy and redressability is required. Plaintiffs

need not show that the preparation of an SEIS would change the Army Corps'

ultimate decision regarding the HDP, but only that "the disregard of [NEPA] could

impair a separate concrete interest of [plaintiffs']."[122]

---

[120]    *United States v. Hays*, 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-31 (1990)) (alteration in original).

[121]    *New York Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2003) (quotations omitted).

[122]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many

34

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."[123] The members of the plaintiff organizations, and individual plaintiff Andrew Willner, aver that they have curtailed their former use of the waterbodies in the Newark Bay Study Area for fear of pollution, which they allege will be exacerbated by the Army Corps' decision to proceed with the HDP without further NEPA review. [124]

The plaintiff organizations have standing to bring suit on behalf of their members, because the interests the organizations seek to protect are germane to their purposes, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[125] In addition, plaintiff organizations have alleged that, due to the Army Corps' refusal to prepare an SEIS, plaintiff organizations have diverted their resources to technical analysis of

---

years.").

[123]    *Friends of the Earth v. Laidlaw Env'tl. Servs.*, 528 U.S. 167, 183 (2000).

[124]    *See* Declarations of Fletcher Harper, Laurel Kearns, James Scarcella, Melvin Wedbush and Andrew Willner in Support of Plaintiffs' Motion for Summary Judgment.

[125]    *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

the impacts of the dredging on the Superfund site.[126]  The cost of this diversion of resources is a sufficient injury to confer standing on the organization on its own behalf.[127]

## B.  Laches

Defendants argue that plaintiffs' claims are barred by laches.  A party asserting a defense of laches must establish that "(1) the plaintiff knew of defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."[128]  "[L]aches is a doctrine of equity that is only rarely invoked in environmental cases, on account of the strong public interest in effecting compliance with NEPA."[129]

Defendants' argument for the application of laches rests on a

---

[126]  *See generally* Declaration of Lawrence Levine in Support of Plaintiffs' Motion for Summary Judgment.

[127]  *See, e.g., Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (finding standing for housing organizations forced to divert resources away from other activities to investigate and challenge defendants' discriminatory housing practices).  *See also California v. Atlantic Richfield Co. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.)*, No. MDL 1358, 2005 WL 1500893, at *3 (S.D.N.Y. Jun. 24, 2005); *Transport Workers Union of Am. v. New York City Transit Auth.*, 342 F. Supp. 2d 160, 167 (S.D.N.Y. 2004); *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 274 (E.D.N.Y. 2002).

[128]  *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998).

[129]  *Rochester v. United States Postal Service*, 541 F.2d 967, 977 (2d Cir. 1976).

misapprehension of the nature of plaintiffs' claims. The Army Corps argues that "at its core plaintiffs' lawsuit challenges [the Army Corps'] dredging methods and the adequacy of the Army Corps' prior NEPA analyses."[130] Accordingly, the Corps argues that plaintiffs delayed unreasonably between the completion of the Corps' 1999 FEIS and the bringing of this suit. In support of this assertion, the Corps points to certain statements by plaintiff Baykeeper which suggest that Baykeeper "opposes *all* deepening activities within the harbors."[131] Regardless of what plaintiffs' broader policy ambitions may be, this lawsuit is specifically focused on the Corps' decision to proceed with dredging without preparation of an SEIS to consider alleged new impacts resulting from the Feb. 2004 AOC.[132] The first of the challenged decisions occurred on December 29, 2004, and plaintiffs brought suit quite promptly, on January 21, 2005.

---

[130]    Army Corps' Memorandum of Law in Support of Motion for Summary Judgment ("Army Corps Mem.") at 45.

[131]    *Id.* at 45 n. 15 (citing "Issues: Dredging of Harbor Ship Channels," document available at http://www.nynjbaykeeper.org/issues/issues_dredging.php).

[132]    Although plaintiffs repeatedly criticize the project as a whole, claiming that dredging will result in unacceptable levels of resuspension of contaminated sediments, *see, e.g.,* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment at 19, 21, plaintiffs make it quite clear that the specific basis for their motion is the narrower claim that dredging will interfere with the RI/FS.

In the year following the signing of the February 2004 AOC,

plaintiffs repeatedly attempted to resolve their concerns with the Army Corps and

the EPA through negotiation.[133] Throughout this period, it was reasonable for

plaintiffs to believe that the Corps might alter its plans without the need for

litigation.[134] Plaintiffs did not unreasonably delay in bringing suit.[135] Although

plaintiffs did not demand that the Corps prepare an SEIS until November 24,

2004,[136] plaintiffs in a NEPA case cannot be faulted for reasonable and good faith

attempts to bring environmental considerations to the attention of the agency

through methods less formal than the preparation of an SEIS.

Moreover, even if plaintiffs had delayed unreasonably, defendants

---

[133]    *See, e.g.,* May 3, 2004 email from Baykeeper to Shea, Army Corps, AR 42:18000 (requesting meeting to "discuss [Army Corps] coordination with EPA, especially with respect to dredging in Newark Bay and other areas under study under the guise of CERCLA."); September 28, 2004 Letter from NRDC to Amelia Wagner, Office of Regional Counsel, EPA, copied to Army Corps (urging EPA to revise draft plan for RI/FS in light of Army Corps' activities).

[134]    Indeed, even after plaintiffs brought this suit, the Army Corps continued to maintain that it had not "consummated its decisionmaking process on the new information." Army Corps' April 26, 2005 Letter to the Court at 2.

[135]    *See Ocean Advocates v. United States Army Corps of Eng'rs,* 402 F.3d 846, 863 (9th Cir. 2005) ("It would prove particularly unfair to [plaintiff], and the public, to find that laches bars this action when [plaintiff] reasonably attempted to resolve its [] concerns administratively in the first instance before spending the necessary time and expense to litigate.").

[136]    *See* Levine Decl. ¶ 22.

38

have failed to make a sufficient showing of prejudice. In NEPA cases, the test of prejudice is

> whether the plaintiff's delay in bringing the suit has resulted in construction proceeding 'to a point where any significant environmental damage has already been done' and whether, in the alternative, 'construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan.'[137]

Plaintiffs are not attempting to put a stop to all dredging in the Bay. Rather, plaintiffs are attempting to force the Army Corps to give additional consideration to the means by which dredging is to be coordinated with the EPA's RI/FS. The EPA's RI/FS is an extensive, multi-year process, which has not yet begun. It is not too late for additional analysis of methods of coordination to help mitigate the impact of dredging on the RI/FS. The Army Corps claims, no doubt accurately, that "[t]he cost of [] altering these projects now is substantial,"[138] but that is far from sufficient to show that it would be "impracticable or impossible"

---

[137] *Riverdale Env'tl Action Comm. along Hudson-R.E.A.C.H. v. Metropolitan Transp. Auth.*, 638 F. Supp. 99, 103 (S.D.N.Y. 1986) (quoting *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975)). *Accord Apache Survival Coalition v. United States*, 21 F.3d 895, 912 (9th Cir. 1994) ("Prejudice in this context must be measured by what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent through the relevant statutory scheme is now irreversible, or is reversible only at undue cost to the relevant project.").

[138] Army Corps Mem. at 46.

for the Army Corps to alter its dredging methods. I note that the Army Corps, the EPA, and the state environmental authorities have committed to coordination of their activities and to ongoing monitoring and analysis of their cooperation; surely, if this ongoing cooperation is to be more than a paper exercise, the Corps must still have some flexibility to refine its dredging methods.

## C. The Merits of Plaintiffs' NEPA Claim

### 1. The Army Corps Was Required to Take a Hard Look at the Significance of New Circumstances

The Army Corps argues that the designation of the Newark Bay Study Area cannot be considered a "significant new circumstance" requiring the preparation of an SEIS.[139] Rather, the Army Corps contends that "at most, the designation [of Newark Bay as a Study Area under CERCLA] constitutes a change in the Bay's legal status, which courts have not recognized as triggering the need for an SEIS."[140] Therefore, the Army Corps argues that it was under no obligation even to take a 'hard look' at plaintiffs' purported "new information." This

---

[139] *Id.* at 25 (citing, *inter alia*, *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984) (holding that "an agency cannot have acted arbitrarily or capriciously in deciding not to file an SEIS unless the new information provides a seriously different picture of the environmental landscape such that another hard look is necessary.")).

[140] *Id.* at 26.

argument fails for two reasons.

*First*, the Feb. 2004 AOC represents more than a mere change in the Bay's legal status. The AOC requires Occidental and the EPA to conduct an RI/FS in the Bay to determine what clean-up measures, if any, can be taken.[141] This is not merely a change in the label attached to the Bay; it is a physical change in the activities that will take place in the Bay.

The CEQ's regulations require that, when an agency considers the environmental impact of its activities, it must take into account "indirect effects."[142] Indirect effects are defined in the CEQ's regulations as [effects] which are caused by the action and are later in time or farther removed in distance, but

---

[141] *See supra* Part II.A, pp. 7-10. The parties hotly dispute the extent to which the AOC commits the EPA to conduct such a clean-up. The Army Corps contends that a clean-up is only a possibility. Despite plaintiffs' claims that some remedy is inevitable, the AOC itself states that one of the "alternative remedial actions" the EPA will consider at the conclusion of the RI/FS is "[a] no action alternative." Feb. 2004 AOC Statement of Work at 3, AR 48:16154. However, although it is not *certain* that the EPA will clean up the Bay, NEPA requires consideration of "reasonably foreseeable" effects, not just certain ones. *See Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) ("an environmental effect is 'reasonably foreseeable' if it is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.") (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)). There can be no serious doubt that some remedial action is sufficiently likely to occur that the possibility must be taken into consideration.

[142] 40 C.F.R. § 1502.16.

are still reasonably foreseeable."[143] Indirect effects are defined broadly, to

"include growth inducing effects and other effects related to induced changes in

the pattern of land use, population density or growth rate, and related effects on air

and water and other natural systems, including ecosystems."[144] The CEQ's

regulations also require that agencies consider the "cumulative impact" of their

activities — i.e., "the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions."[145] Plaintiffs' experts contend that the HDP

will interfere with the RI/FS, and therefore will have the indirect effect of

preventing the EPA from taking remedial action, or reduce the effectiveness of

whatever remedial action the EPA may take.[146] If plaintiffs are correct, then the

---

[143]   40 C.F.R. § 1508.8.

[144]   *Id.*

[145]   40 C.F.R. § 1508.7.

[146]   *See* Declaration of Robert J. Livingstone, Ph.D., in Support of
Plaintiffs' Motion for a Preliminary Injunction ("Livingstone Decl."), ¶¶ 22-25
(arguing that the Corps' proposed dredging will "complicate, prolong and
potentially undermine the Superfund cleanup. It will do so by redistributing
contaminants, thus rendering moot or useless the sampling results from the
Superfund study. The conditions sampled in the RI/FS will not reflect reality after
dredging.").

HDP may have significant new environmental consequences, whether these are seen as indirect or cumulative effects.

This case is therefore very different from *Swanson v. Forest Service*,[147] on which the Army Corps relies. In *Swanson*, the Ninth Circuit held that the change in the legal status of salmon from a "sensitive" to an "endangered" species was not a significant new circumstance requiring an SEIS: the court held that

> the new listing changed the legal status of the salmon, but it did not change the biological status. The Forest Service previously determined that it was unlikely that the proposed actions would have a negative impact on the salmon; as this finding was not premised on the salmon's non-threatened status, the determination that the salmon were in fact threatened did not constitute new information.[148]

Here, the CERCLA designation itself is not significant; it is a change in the Bay's legal status, but not its environmental characteristics. The Corps' previous findings regarding the impacts of dredging in the Bay are not disturbed by this change in status. However, the fact that the Corps' dredging will take place alongside an RI/FS is a real, physical change, that may alter the environmental impact of dredging. Whether this change is a significant one is an empirical and

---

[147]    87 F.3d 339 (9th Cir. 1996).

[148]    *Id.* (citation and quotation omitted).

scientific question, which requires adequate consideration by the Army Corps.[149]

More fundamentally, the Army Corps' argument is contrary to the

standard of review prescribed by *Marsh* and *Grand View*.[150] It is the initial

responsibility of the agency, not the Court, to determine whether new information

or circumstances are sufficiently significant to warrant an SEIS. Under *Grand*

*View*, the Court's role is to determine whether the agency took a sufficiently "hard

look" at the significance of new circumstances, and, if so, whether its decision that

they were not significant was arbitrary or capricious. An agency violates NEPA

when it fails to give adequate and timely consideration to the significance of new

circumstances, regardless of whether it is able, during the ensuing litigation, to

provide evidence that the new circumstances are not significant.[151] The threshold

---

[149]    The Corps' argument that "plaintiffs have adduced nothing more than
conclusory allegations and speculation to support their contention" that dredging
may interfere with the RI/FS is misplaced. Army Corps Mem. at 27. *First*,
plaintiffs have submitted expert analysis to support their argument: it is
'speculative' only in the sense that it deals with possible future events. *Second*, it
is the Corps' duty to evaluate the significance of the new circumstances, not
plaintiffs'.

[150]    *See Marsh,* 490 U.S. at 376; *Grand View,* 947 F.2d at 657.

[151]    *See Marsh,* 490 U.S. at 385 ("Regardless of its eventual assessment of
the significance of this information, the Corps had a duty to take a hard look at the
proffered evidence."); *Friends of the Clearwater*, 222 F.3d at 558 ("Although the
Forest Service now can point to data that, if timely considered, would have shown
that the new information did not require an SEIS, this does not demonstrate that

question, therefore, is not whether the new circumstances were significant, but whether the Army Corps took a sufficiently hard look at the significance of those new circumstances.[152]

---

the Forest Service complied with NEPA, which demands timely and reasoned agency action."); *NRDC v. Lujan*, 768 F. Supp. 870, 889 (D. D.C. 1991) ("A court's role in reviewing a decision not to supplement an EIS involves carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision based on its evaluation of the significance — or lack of significance — of the new information. . . . Affidavits such as those presented here are no substitute for an explanation in the [record] itself that environmental impacts were considered and determined to be significant or not.") (quotation omitted).

[152]   The Army Corps argues that this standard — which it calls "a 'one-step' inquiry whereby a plaintiff need only prove that the agency failed to take a 'hard look' at purported information, regardless of its significance" — may result in courts finding "violations of NEPA even where the new information is patently insignificant." Army Corps Reply Memorandum in Support of Motion for Summary Judgment ("Army Corps Reply Mem.") at 2. While this risk may exist, NEPA is a procedural statute, and requires compliance with its procedures at the proper time; failure to comply with those procedures cannot be excused in hindsight. As a practical matter, though, the Army Corps' concern is overstated, for two reasons. *First,* under *Marsh,* courts must apply a "rule of reason" to their review of the sufficiency of the agency's decision-making; in addition, *Marsh* makes clear that courts need only ask whether an agency's decision was based on "consideration of the *relevant* factors." *Marsh,* 490 U.S. at 375, 378. If new information is truly *patently* insignificant, an agency may be able to meet its obligations under NEPA with only the most cursory look at its significance, and if it is simply irrelevant, the agency need give it no consideration. *Second,* if the agency is able, during litigation, to demonstrate that information that it failed to consider in a timely manner is in fact insignificant, that may be considered when determining whether any injunctive relief is required. *See, e.g., Friends of the Clearwater,* 222 F.3d at 560. In any case, for the reasons discussed above, the concerns raised by plaintiffs here cannot be described as irrelevant or *patently* insignificant; plaintiffs' concerns were clearly sufficiently substantial to deserve

2. **The Army Corps Failed to Comply with NEPA Because It Did Not Take the Required Hard Look**

   a. **The Army Corps' Subsequent Decision to Prepare an EA Is Not a Concession That Its Prior Review Was Inadequate**

At the outset, plaintiffs' argument that the Corps' decision to prepare an EA[153] is a concession that its previous environmental review was inadequate is without merit. The Corps has never conceded that it is required to prepare an SEIS, although it has suggested that it would consider the possibility.[154] In fact, the Corps has suggested that the purpose of the EA is to "document why no SEIS is necessary."[155] This is somewhat disturbing. The purpose of an EA is not to document a foregone conclusion, but, pursuant to the Corps' regulations, to "provide[] sufficient information to the district commander . . . for determining *whether* to prepare an SEIS or a FONSI."[156] "[A]n agency's NEPA analysis 'must be taken objectively and in good faith . . . and not as a subterfuge designed to

_____

proper consideration.

[153]  *See* Army Corps' April 26, 2005 Letter to the Court.

[154]  *See id.*

[155]  AR 2:263.

[156]  33 C.F.R. § 230.10 (emphasis added).

46

rationalize a decision already made.'"[157] Nevertheless, the question before the

Court is whether the Corps' review of the issue prior to December 29, 2004 and

March 11, 2005 was reasoned and adequate; the quality of the Corps' subsequent

documentation is irrelevant.[158]

### b. The Prior Environmental Reviews Conducted by the Corps Are Sufficient to Address Certain Issues

Although the analysis the Corps engaged in between October and

December 2004 was brief and informal, it built on decades of prior environmental

review. Plaintiffs challenge that review on the ground that the Corps failed — as

far as the record shows — to consider the results of its own 2003 report, "SSFATE

[Suspended Sediment FATE] Modeling of Arthur Kill Dredging."[159] This report

used a new model to derive predictions regarding the effects of dredging which

differed significantly from those of the reports on which the 1999 FEIS relied.

---

[157] *Citizens Advisory Comm. on Private Prisons, Inc. v. United States DOJ*, 197 F. Supp. 2d 226, 250-51 (W.D. Pa. 2001) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)).

[158] To hold otherwise would create a perverse incentive, discouraging federal agencies from voluntarily conducting any supplemental environmental review in response to a plaintiff's demands, for fear of being found to have conceded a violation of NEPA. This would pointlessly frustrate settlement negotiations.

[159] SSFATE Report, AR 30:11302-905.

Notably, the 1999 FEIS concluded that resuspended sediments would travel no further than 500 feet from the dredge; the SSFATE Report predicts that resuspended sediments will travel up to two miles.[160] The Corps' January 2004 EA/LRR addressed the SSFATE Report, albeit only in the context of the impact of dredging on fish habitats. The failure to give greater consideration to the SSFATE Report, though questionable, does not by itself demonstrate that the Corps failed to take the requisite "hard look." "NEPA does not require that [the Court] decide whether [a finding of no significant impact] is based on the best scientific methodology available."[161] The Corps' analysis of sediment resuspension was

---

[160] Compare 1999 FEIS, AR 11:2798-99 with SSFATE Report, AR 30:11314. See also Declaration of W. Frank Bohlen, Ph.D., in Support of Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 14-17 (contrasting SSFATE Report with studies relied on by the Corps), AR 48:16029-30. With respect to at least one key issue, however, the SSFATE Report is consistent with the Corps' other studies: the SSFATE Report concludes that resuspension from dredging is "transient" and significantly less than resuspension from other sources, including shipping. SSFATE Report, AR 30:11302-905.

[161] *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985). *See also Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 861 (7th Cir. 2003) ("when an agency's finding of no significant impact is based upon adequate data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious.").

based on adequate scientific data.[162]

Accordingly, the Corps' determination, in its December 16, 2004 memorandum and its February 28, 2005 Statement of Findings, that the designation of the Bay as a CERCLA Study Area, by itself, did not require additional NEPA documentation, is beyond reproach. Plaintiffs suggest that the AOC signalled a new public policy in favor of cleaning the Bay, requiring the Corps to revisit the entirety of its prior analysis of the environmental impacts of dredging. However, even if CERCLA designation represents a shift in public policy, it is irrelevant to the Corps' NEPA obligations: as in *Swanson*, a shift in public policy, by itself, is not an environmental change that requires additional NEPA review. The Corps' extensive prior environmental reviews sufficiently analyzed the environmental impacts of dredging in the Bay, on, *inter alia*, water

---

[162] *See, e.g.,* 1999 FEIS, AR 11:2798 (discussing findings of 1997 study, "Water quality monitoring of Howland Hook Dredge Operation"); December 14, 2004 Memorandum for Record, "Approaches on Minimizing Re-suspension of Sediment in Dredging," AR 2:264 (discussing findings of 2002 study, Total Suspended Sediment and Turbidity Monitoring in Newark Bay, Kill Van Kull and Port Jersey"). As discussed below, however, while the Corps' review covered many aspects of the environmental impact of dredging, the Corps' environmental review did *not* consider the issue of the possible impacts of dredging on sampling for an RI/FS, or methods by which those impacts could be minimized.

quality,[163] noise, odor and aesthetics,[164] geological stability,[165] exposure of biological receptors to contaminants,[166] and human health and safety,[167] and considered methods for minimizing those effects. This review has not been affected by the change in legal status of the Bay. Whether the HDP should proceed despite the change in the legal status of the Bay is a legal and policy determination rather than a scientific or empirical one, and the Corps' brief dismissal of this issue was sufficient to constitute a hard look.[168]

### c.    The Impact of the HDP on the RI/FS

The important question here, however, is not whether the mere fact of the AOC itself somehow called for additional NEPA review; the question is whether the HDP will have significant impacts on the RI/FS that will be conducted

---

[163]    *See* 1999 FEIS, AR 11:2788.

[164]    *See id.*, AR 11:2793.

[165]    *See id.*, AR 11:2795.

[166]    *See id.*, AR 11:2796.

[167]    *See id.*, AR 11:2805.

[168]    *See, e.g.,* Dec. 16 Mem. ("the Newark Bay issue was addressed in detail in the EIS, and no substantial changes in the physical or chemical nature of its sediments in the project occured as a result of the ACO [sic]. Therefore all analyses conduced and conclusions derived from them in the original EIS are still valid.").

in the Bay pursuant to the Feb. 2004 AOC.[169] As I have said, the fact that

sampling for an RI/FS will be performed is a physical change in the activities that

will take place in the Bay, not just a change in legal status. When the Army Corps

conducted its pre-February, 2004 environmental analysis, it did not know that

Tierra would be carrying out sampling studies for an RI/FS in the Bay. The

presence of Tierra's sampling activities in the Bay is a physical change. This

sampling is likely to be essential for the effectiveness of the EPA's cleanup of the

Bay (or to determine whether such a cleanup is feasible). Dredging may

significantly disrupt or frustrate Tierra's activities, and therefore delay or prevent a

cleanup of the Bay. The Corps' prior review of dredging methods and the direct

environmental effects of resuspension due to dredging does not address the issue

of whether dredging will interfere with sampling.

### i.    Pre-December 29, 2004

The Corps' pre-December 29, 2004 consideration of the possible

effects of dredging on the RI/FS was inadequate. Many of the documents on

which the Corps relies — specifically, the email communications between the

---

[169]    Although it is not for plaintiffs (or the Court) to say whether the HDP
will in fact interfere with the RI/FS, I note that plaintiffs have submitted weighty
expert testimony to support their argument that it will have that effect. *See*
Livingstone Decl. ¶¶ 22-25, *supra* n. 146.

EPA and the Corps prior to October, 2004, attempting to arrange a meeting between EPA and Corps officials to discuss the impact of the AOC — are without substance.[170] The Corps' substantive consideration of the issue began in October 2004 at the earliest. The record establishes that the Army Corps, despite its efforts to review its dredging methods and re-examine its prior environmental analysis, failed to give serious consideration to the potential impacts of dredging on sampling for the RI/FS, or the means by which those impacts could be minimized, before awarding the Arthur Kill dredging contract on December 29, 2004.

The Corps' determination that dredging would have no significant impact on the RI/FS was based almost entirely on the EPA's statements, as recorded in the Corps' internal documents. *First*, a December 1, 2004 memo records that the EPA informed the Corps that "whether Newark Bay is designated a Superfund Site will not prevent all activity, such as harbor deepening." Clearly, a statement that dredging need not halt altogether is not the same as a statement that dredging will not have significant impacts on the RI/FS.

The Corps' record of the December 6, 2004 meeting with the EPA states that the EPA informed the Corps that "based on existing information and

---

[170]    *See supra*, Part II.E., n. 54.

ongoing coordination, the dredging planned for the HDP in Newark Bay would not delay or prevent an effective cleanup."[171] Such "[s]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA."[172] "[C]onclusory remarks . . . do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the [agency's] reasoning."[173]

This conclusory statement is no more satisfactory because it originates outside the Army Corps, in an agency with relevant expertise. An agency is justified in relying on another agency's finding of no significant impact

---

[171]    Nicholson Mem., AR 42:12574.

[172]    *Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985). *See also Davis v. Mineta*, 302 F.3d 1104, 1122-23 (10th Cir. 2002) ("A conclusory statement that growth will increase with or without the project, or that development is inevitable, is insufficient; the agency must provide an adequate discussion of growth-inducing impacts."); *National Audubon Soc'y*, 132 F.3d at 17 (finding insufficient a conclusory statement that mitigation measures will prevent significant environmental impact, where it was unsupported by detailed studies or other substantial evidence of efficacy); *Senville*, 327 F. Supp. 2d at 369 (finding conclusory and "dismissive treatment" of issue insufficient to support a finding of no significant impact); *Friends of the Earth, Inc. v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42 (D. D.C. 2000) (finding violation of NEPA where finding of no significant impact was supported by "no actual analysis, only [a] conclusory statement.").

[173]    *NRDC v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988).

where that agency's finding is supported by reasoned analysis.[174] There is no indication in the record here that the EPA's statement is supported by anything more than a hunch.[175]

The Corps argues that there is "no practical reason why the Army Corps cannot reasonably rely upon EPA's informal statements."[176] This argument misses the point: there is no reason why a conclusory statement that would not pass muster under NEPA if made by the Army Corps itself should be found sufficient simply because it originated with an outside entity. To hold otherwise

---

[174] *See, e.g., Laguna Greenbelt v. United States Dep't of Transp.*, 42 F.3d 517, 529 (9th Cir. 1994). In *Laguna*, the Federal Highway Administration (FHA) properly relied on consultation with other federal agencies to determine that a forest fire had not given rise to significant new circumstances requiring an SEIS. The FHA's consultation with one agency resulted in a new Biological Opinion. The second agency, the Army Corps, submitted a written report to the FHA, prepared by its biological experts.

[175] The Army Corps argues that Pavlou's February 28, 2005 Declaration sets out the basis for the EPA's December 6, 2004 statements. Even if this is true, Pavlou's declaration is scarcely less conclusory. Pavlou states that "dredging will not diminish the usefulness of the RI/FS" because the RI/FS must, in any case, "account[] for" the "current and existing conditions in Newark Bay," which include vessel traffic and other ongoing maintenance dredging. Pavlou Decl. ¶ 11, AR 48:16273. Pavlou's declaration provides no analysis of the relative impacts of the HDP and those other sources of disturbance. Nor does Pavlou discuss measures the Corps may take to reduce the impact of dredging, or to help the EPA to 'account for' the Corps' activities.

[176] Army Corps Reply Mem. at 7.

would render NEPA toothless. The fact that the EPA possesses special expertise in this matter makes no difference. The expertise and analysis underlying the agency's findings must be apparent from the record. That is not the case here.

The Corps' finding that dredging will not interfere with the RI/FS also relies heavily on the promise of future coordination between the Corps and the EPA. The Second Circuit has held that "[w]hen the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an [S]EIS."[177] The Court has no reason to doubt the Corps' good-faith intention to coordinate with the EPA. The record shows, for example, that the Corps and the EPA have communicated regarding the Corps' dredging schedule.[178] However, the record does not contain any substantive discussion of the form this coordination will take, or how the effectiveness of that coordination will be monitored. The Corps' "Construction Monitoring and Management Plan," discussed in the 1999 FEIS, is of course silent on the issue of the impact of dredging on the RI/FS, which was not planned until 2004.[179] The

---

[177] *National Audubon Soc'y*, 132 F.3d at 17.

[178] *See supra*, Part II.E., n. 59.

[179] *See* 1999 FEIS, AR 11:2867-69.

Corps' ongoing monitoring obligations under the WQCs, though substantial, also do not address this specific issue. NEPA requires that the Corps give these issues timely and public consideration.[180]

The Corps' December 16, 2004 memorandum contains no further analysis of the impact of dredging on the RI/FS.[181] The memorandum simply relies on the fact that "no substantial changes in the physical or chemical nature of [the Bay's] sediments in the project occurred as a result of the AOC."[182] For the

---

[180]     Plaintiffs' expert suggests a number of ways in which the Corps should coordinate its activities with the RI/FS, including: "by sampling before and after Deepening activities occur (to measure changes) . . . by pinning down where redistributed (contaminated) sediment is settling and then sampling in those locations, and by timing the dredging and blasting so that those activities do not render obsolete Superfund samples taken previously in the same areas." Livingstone Decl. ¶ 24. Of course, NEPA does not require that the Corps actually adopt any of these measures.

[181]     In preparing the December 16 Memorandum, the Corps re-reviewed the dredging methods used in the Hudson River Superfund Site, in which "limited navigational dredging" will take place alongside a Superfund cleanup (as opposed to an RI/FS). *See* December 14, 2004 Memorandum to Record, "Comparison of Hudson River PCBs Cleanup and NY Harbor 50," AR 2:274-79. This review gives serious consideration to the appropriate dredging and resuspension control technologies for Newark Bay, in order to reduce resuspension's direct effect on the environment. However, it does not touch on the key issues of the potential impact of dredging on sampling to be conducted for the RI/FS, or on methods of coordination that might minimize that impact. In fact, the discussion states that in Newark Bay, "resuspension is a concern" *only* because "it may bury benthic [*i.e.*, bottom-dwelling] organisms." AR 2:275.

[182]     Dec. 16 Mem., AR 2:262.

reasons given above, this statement, while true, misses the point. The signing of the AOC was — of course — a mere legal change, which did not affect the physical character of the Bay. The point is that, pursuant to the AOC, an RI/FS will take place in the Bay, something that was not true before the AOC. The Corps' dredging activities *may* have significant impacts on the RI/FS, and thus on the environment. That issue — an empirical and scientific question — should have been explored properly, but was consistently overlooked. I therefore find that the Corps failed to take a hard look at the significance of the AOC before December 29, 2004, and was in violation of NEPA and the APA with respect to the AK 41/40 Project.

### ii.     Pre-March 11, 2005

Between December 29, 2004 and March 11, 2005, the Corps prepared a draft Statement of Findings, and produced a number of declarations in opposition to plaintiffs' motion for a preliminary injunction. The Statement of Findings contains no further analysis of the possible impact of dredging on the RI/FS. The Statement merely repeats the Corps' prior determinations that the February 2004 designation of the Bay as a CERCLA Study in itself does not require NEPA documentation, that dredging need not entirely halt for the RI/FS to

take place, and that the EPA will coordinate its activities with the Corps.[183] The

Declaration of George Pavlou, as noted above, is simply too conclusory to

constitute the requisite "hard look." The Declaration of Robert Engler contains a

detailed rebuttal of plaintiffs' contention that "dredging as currently proposed

under the Project will resuspend and redistribute unacceptable amounts of

contaminated sediments into Newark Bay."[184] The basis for Dr. Engler's

conclusory statement that "the Project, as currently proposed, will not negatively

impact the [EPA's] RI/FS," however, is entirely unclear from the record.[185] I

---

[183]    The only new substantive discussion in the Statement of Findings appears in the "Draft 2005 NRDC NOI Response Table," where the Corps argues that "since the material to be removed by the HDP dredging is tested prior to its removal to determine its placement options and these test results are provided to the state regulatory agencies for their use in issuing Water Quality Certificates, the District is confident that the material being removed will not impact the results of the FS/RI or any potential remedial action." AR 1:189. But there is no support for the conclusion that pre-removal testing will avoid any untoward impact on the RI/FS.

[184]    Engler Decl. ¶ 3. *See supra* Part IV.C.2.b.

[185]    *Id.* ¶ 4. *See, e.g., Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004) ("the only mention of cumulative effects in the two EAs comes in the form of generalized conclusory statements that the effects are not significant or will be effectively mitigated. At oral argument, counsel for the BLM assured us that to the eye of the 'agency specialists,' the scant information included in the EAs is sufficient to determine what the cumulative environmental impacts will be and supports the conclusory statements that they will not be significant. But while the conclusions of agency experts are surely entitled to deference, NEPA documents are inadequate if they contain only narratives of

therefore find that the Corps had not taken a sufficiently "hard look" at the impact of dredging on the RI/FS by March 11, 2005, and was in violation of NEPA and the APA with respect to the decision to begin the 50 foot HDP.

The Corps failed to take a hard look at the possible effects of dredging on the RI/FS before December 29, 2004 or March 11, 2005. Plaintiffs, for their part, have submitted expert testimony that raises a substantial possibility that dredging will have significant effects on the RI/FS. "A party challenging the agency's decision not to prepare a supplemental EIS must show only that there is a substantial possibility that the action may have significant new impacts, not that it clearly will have such impacts."[186] On the basis of the present, deficient record, it was arbitrary and capricious for the Corps to decide that it was not required to prepare an SEIS to consider the effects of dredging on the RI/FS.[187]

---

expert opinions.").

[186] *Senville*, 327 F. Supp. 2d at 356 (citing *National Audubon Soc'y*, 132 F.3d at 18 (applying "substantial possibility" standard to decision not to prepare an EIS)).

[187] *See National Audubon Soc'y*, 132 F.3d at 18 (finding that Forest Service's decision to proceed with project without preparing an EIS was arbitrary and capricious, "based on the record before it," given its failure to take a hard look at the environmental consequences). *See also NRDC*, 268 F.3d at 97 ("an agency decision may be set aside where the agency has [] entirely failed to consider an important aspect of the problem.") (quotation omitted).

Although plaintiffs have brought very narrow claims, the language of their Complaint and motion papers suggests that they have very broad objections to the Corps' project. It is therefore important to stress the narrowness of today's holding. I hold only that the Corps failed to take a hard look at the potential impacts of dredging on the RI/FS, and at methods of coordination with the EPA that might reduce those impacts, if any, and that the Corps' decision to proceed without an SEIS in the absence of such a hard look was arbitrary and capricious. I do not hold that the Corps' review was inadequate with respect to any other issues raised by plaintiffs. Nor do I hold that the impact of dredging on the RI/FS will, in fact, be significant enough to require the preparation of an SEIS. The Court has no competence to make that evaluation on the basis of the present record.[188] It is entirely possible that, once the Corps has taken the necessary 'hard look' at the issue, it will be justified in finding that no SEIS is required.

This Opinion addresses only the question of whether the Corps is in violation of NEPA and the APA. Further briefing will be required to address the

---

[188]   *See id.* (holding that the question of whether "the impact of the proposed action was potentially significant [] is substantive, and consequently not one within the purview of the district court. Rather, it is one the Forest Service must decide. The Forest Service's failure to weigh the factors related to its project's environmental impact is a flaw that precludes a definitive determination as to whether the project may have a significant impact.").

issue of remedy. In particular, the parties should address the issue of whether the additional environmental review conducted by the Corps in the course of preparing its proposed EA is sufficient to moot plaintiffs' demand for relief.[189]

## V. CONCLUSION

For the foregoing reasons, I find that the Corps' December 29, 2004 decision to proceed with the AK 41/40 Project, and its March 11, 2005 decision to proceed with the HDP 50 foot Project, were made without a "hard look" at the environmental consequences, and were arbitrary and capricious, in violation of NEPA and the APA. The parties are to jointly propose a briefing schedule on the issue of remedy, no later than August 19, 2005. At the same time, the parties should submit letter briefs of no more than five pages addressing the issue of the extent of the record to be considered by the Court in determining the appropriate remedy.[190]

---

[189]     *See Friends of the Clearwater*, 222 F.3d at 560 ("'The district court could not order the Corps to conduct studies already completed to answer questions the Corps already has answered on a basis that could not be successfully challenged.'") (quoting *Warm Springs Dam Task Force*, 621 F.2d at 1025).

[190]     *See, e.g., id.* at 558 (in SEIS case, admitting documents created after the start of litigation to determine what relief should be granted).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 5, 2005

## - Appearances -

**For Plaintiffs:**

Mitchell Bernard, Esq.
Lawrence Levine, Esq.
Natural Resources Defense Council
40 West 20th Street
New York, New York 10011
(212) 727-2700

**For the Government Defendants:**

Ramon Reyes
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007
(212) 637-2740

**For Intervenor Donjon Marine, Inc.:**

Daniel McInerney, Esq.
Hill Rivkin & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600

**For Intervenor New York Container Terminal, Inc.:**

Martin Domb, Esq.
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281
(212) 839-7000